# ROBERTS ET AL. v. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LARAMIE.

Official Bonds — County Treasurer — Loss of Public Money by the Failure of a Bank — Principal and Surety.

1. Recovery may be had upon the official bond of a county treasurer in force at the time of the loss of public moneys; notwithstanding the subsequent giving of a new bond upon request of the county board, it not appearing that the money lost had come into the actual possession of the officer at any time after giving the new bond.

2. In a suit against a county treasurer and his sureties upon his bond in force at the time of the actual loss of the money sued for, an allegation that the officer had failed to pay the money to his successor in office, is sufficient to authorize a recovery; although a subsequent bond had been given and was in force at the expiration of his term; where from the pleadings and evidence it appears that the officer's duty to dispose of the money had not arisen until the qualification of his successor, and the money had not been in the possession of the treasurer at any time after its loss and the giving of the new bond. The better pleading, however, would be to charge the treasurer with the duty of safely keeping the public moneys, allege the loss of the money under such circumstances as to render him responsible, and his failure to pay to his successor, thus showing the default to have become complete.

3. If neither the bond otherwise, nor the statute requires a county treasurer to keep public money safely, so that, in case of loss, a showing that it occurred without fault upon the part of the officer would be inadmissible, such a duty or liability is not to be found in a condition of the bond that the officer shall deliver all moneys belonging to his office to his successor in office.

4. By reason, solely, of a condition in an official bond that the officer shall deliver to his successor in office all moneys, books, papers, and other things appertaining or belonging to his office, a public officer is not constituted an insurer of the safe keeping of money coming into his official custody, so as to exclude a defense, in case of loss, that it occurred without any fault, or lack of diligence, faithfulness, or skill upon his part.

5.  Under the statute, and the condition of the bond as afore-
said, a county treasurer and his sureties are not liable upon
the official bond for a loss of money resulting from the failure
of a bank in which the moneys were deposited, where the
treasurer was without fault, and the loss did not occur through
his unfaithfulness, negligence, or lack of diligence or skill.

6.  The fact that one of the sureties upon the bond of a county
treasurer was the banker with whom the moneys were depos-
ited, and through whose failure they were lost, does not make
said banker liable for said moneys in an action upon the bond,
where the treasurer and the other sureties were not liable;
although said banker remains responsible for the money de-
posited with him, and it may be recovered from him in some
proper action.

7.  A surety may plead and is entitled to any defense which
entirely avoids the obligation.

8.  It is the general rule, that wherever there is no principal
there can be no surety, and whatever discharges the principal
releases the surety.  The exceptions to that rule are those
which are not inherent in, or do not concern, the debt, but
are personal to the debtor; such, for example, as the minority
of the principal, and defenses growing out of his insolvency
or bankruptcy.

[Decided April 3, 1899.  Commenced in district court, April 30,
1896.]

ERROR to the District Court, Laramie County, Hon.
RICHARD H. SCOTT, Judge.

Suit upon the bond of John Roberts as county treasurer
of Laramie County.   The petition alleges default in the
bond as follows: "And for an assignment of a breach of
said bond and writing obligatory the plaintiff alleges that
after the due execution and delivery of the same, and long
prior to the bringing of this action, the said John Roberts
as the county treasurer of said Laramie County aforesaid,
did not, as such county treasurer aforesaid, faithfully and
promptly perform the duties of his said office, and did not
pay over, deliver, or transfer to plaintiff or to his succes-
sor in office as aforesaid, on January 7, 1895, or at any
other time, according to law, all moneys which he received
and collected and which came into his hands as such county

treasurer, and that he did not render a just and true account thereof, and did not pay and deliver over to his successor in office, nor to any other person authorized by law to receive the same, all said moneys, to wit: the sum of $12,642.33, appertaining to and belonging to his said office of county treasurer as aforesaid, which moneys was the property of the plaintiff, and which moneys had come into the hands and possession of defendant, John Roberts, by virtue of his said office as county treasurer aforesaid, and which said moneys it was the duty of the said defendant, John Roberts, under the laws of the State of Wyoming to pay and turn over and deliver to his successor in office as county treasurer of the county of Laramie aforesaid, on the 7th day of January, A. D. 1895; by means of which said premises the said bond and writing obligatory then and there became forfeited, and said plaintiff thereby sustained damages in a very large sum, to wit: $12,-642.33, together with interest thereon from January 7, 1895, to the 11th day of February, 1895, at the rate of 12 per cent per annum, and further interest thereon from February 11, 1895, at the rate of 8 per centum per annum, and thereby an action has accrued to said plaintiff against said defendant to demand, sue for, and have from said defendant the sum of $12,642.33, with interest as aforesaid; and yet the said defendants, although often requested so to do, have not paid or delivered said sum of money nor any part thereof to plaintiff, nor to any other person for and in behalf of plaintiff, but each and every of them have wholly neglected, failed, and refused to pay or deliver said sum of money, and still neglect, fail, and refuse to pay and deliver the same, or any part thereof, to the damage of plaintiff in the sum, etc."

The defendants by answer interposed several defenses, including a general denial of the default; the giving of two additional bonds; the loss of the money sued for without fault or negligence on the part of the officer; and the purchase of a draft for $4,800 of the money sued for from the banker whose failure occasioned the loss, with which

to pay the interest upon certain county bonds in New York
City, and the failure of the bank issuing the draft before
its collection in New York.    A reply was filed, among
other things denying some of the facts alleged in the an-
swer to show the officer's good faith and lack of negligence.

The cause was tried before the court and a jury.    The
plaintiff introduced the following evidence on the trial:
The bond was identified and read.    D. S. Swan testified:
I was successor to John Roberts as treasurer.    I received
from him $21,031.21.    I went into office January 19,
1897.    The cash Mr. Roberts had on hand at the time
my term of office would naturally commence was some-
thing like $91,000.    He paid out between that time
and the time I actually took the office, about $70,000.

H. B. Henderson testified: I examined the accounts of
Roberts, treasurer, in 1894.    He stated to me that he had
$14,153.98 on deposit in the shape of a claim on the Kent
Bank.    Kent had failed in July, 1893.    I again investi-
gated his accounts, Feb. 24, 1896.    Roberts at that time
stated there was yet due from the Kent Bank $12,000,
and some odd hundred dollars.    The difference in these
two amounts was caused by payments to Roberts, treasurer,
by the assignee.

John Roberts testified: I was elected county treasurer,
Laramie County, in 1892, and qualified in January, 1893.
I deposited money of the county with T. A. Kent, Banker.
Of the money so deposited, $12,642.33 was never repaid
to the county.    At the time I succeeded myself as treas-
urer I did not pay that money over to myself as successor.
The money was received from taxes and other revenue.
The greater part of it from taxes.    Here the plaintiff
rested.

The plaintiff in error introduced the following evidence:
Henry G. Hay testified: I am a banker.    I have been
engaged in the business at Cheyenne, Wyoming, for sev-
enteen years.    Was cashier of the Stock Growers Na-
tional Bank until 1894, and since that time have been
president of that bank.    Have been acquainted with T. A.

Kent individually and as a banker for twenty-three years. I knew his general reputation as a banker and the general reputation of his bank for solvency, safety, and solidity in the community where he did business.   That reputation was good in 1892 and 1893 up to the time of his failure. I think his bank was regarded by the general public as full as strong as any bank in the State.   On cross-examination Mr. Hay testified: The reputation of the Kent Bank was good right up to the day of the assignment.   I don't think there was any one who had any serious doubts about Mr. Kent's solvency up to the night he closed his doors.   Up to that time I myself considered the bank all right.

On re-examination he testified: Mr. Kent's reputation as a banker had been good ever since he started in the banking business in 1881.   His habits as a business man were good, — a great deal better than the average.   His reputation for frugality and care taking was very good.

On recross-examination he testified: Mr. Kent was a man of great energy, remarkably attentive to his business. Never neglected his business a moment for anything. Never drank anything.   Not extravagant in any way. He paid careful attention to his business, and I regarded him as a man of good judgment.

The plaintiff moved the court to strike out all of the evidence of Mr. Hay, stating as ground for the motion that the evidence was "incompetent, irrelevant, and immaterial, and that under the statutes of the State of Wyoming with reference to the duties of county treasurer and under the bond in suit in this case, the treasurer is an absolute insurer of the funds of the county, and may not in a suit upon his bond for the default or failure to turn over to his successor part of the moneys received, show as a defense that he deposited them in a bank without negligence on his part."

This motion was sustained by the court, and the defendants each excepted to the ruling.   The defendants called T. A. Kent as a witness.   He testified that he was the banker with whom the treasurer deposited the county funds

in controversy, and that the deposits were made to the credit of John Roberts as county treasurer, and were not mingled with his private funds, and were known by the banker at the time to be moneys of the county. After objections had been sustained to questions seeking to elicit the testimony the plaintiffs in error offered to prove by the witness, Kent, "That the values of the property which he had at the time of the assignment, and had possessed and owned for a number of years prior to the time of the assignment, were more than sufficient to pay all his debts and liabilities of every kind, including the deposits made by the defendant, Roberts, as treasurer, with Mr. Kent. That the excess over and above all liabilities was not less in Cheyenne prior to the assignment as a banker for a than $100,000. That he (Kent) had been in business period of about twelve or thirteen years. That his banking business had been profitable in the community, and largely profitable up to the time of the assignment. That at the time Mr. Kent first went into the banking business he put into that business itself as absolute capital, $100,-000 over and above all amounts received by him from deposits and from every source. That at the time of the assignment he had in property outside of his banking business, and outside of all capital which he had put into that business originally, and outside of all profits derived from it, and outside of all moneys received in any way into that banking business by deposits or otherwise, property that at that time had a value of not less than two hundred thousand dollars, and had maintained that value for a period of not less than five years. That the bank failure was caused solely by a sudden and unprecedented panic such as this country had never before seen, and such as reasonably could not have been anticipated. That the custom of depositing funds in the bank by treasurers of this county which is alleged in the answer and admitted by the reply was a reasonable one and was necessary in this county for the safe keeping of the funds. That there

was no other way whereby the funds belonging to the county which were in the hands of the defendant, Roberts, as treasurer, could be as safely or as securely kept as by depositing them in the manner in which they were deposited in this case.

The defendant in error objected to the testimony offered, putting its objections in these words: "The offer is objected to as incompetent, irrelevant, and immaterial, and for the further reason that the financial condition of Mr. Kent as a banker can not be offered in evidence by the defendant in this case as a defense to the bond in suit, the bond being absolute." The objection was sustained as to each offer, and the defendants excepted.

The defendants offered that portion of the records of the county commissioners relating to the requirement upon John Roberts as county treasurer to give two new bonds. Objections to the introduction of the records were made and sustained, and the ruling excepted to.

The defendants then offered to prove by the witness, Roberts, by detailing the facts of diligence, that he as treasurer, exercised all possible diligence in preservation of the funds here sued for, and that no negligence in any degree whatever on his part as treasurer either caused, or in any degree whatever contributed to, the loss of the money here sued for or any part of it. This was excluded and exceptions reserved.

They also offered the Commissioners' Journal showing the annual checking up of the treasurer's accounts. This was excluded and exceptions reserved.

The evidence disclosed in addition to the above that Mr. Kent, the banker, was the same Kent who signed the bond in suit as one of the sureties; that the treasurer carried on his books as cash the money lost in the bank, until the office was turned over to Mr. Swan in 1897; and that after the failure of the bank none of the money sued for ever was in the possession of Roberts. Judgment was rendered for the county, and defendants prosecuted error,

*John W. Lacey,* for plaintiff in error.

The questions here are two in number, with possible subdivisions.    1. If the new bond required of the treasurer was given and accepted as a substitute for or in lieu of the bond sued on, did that so far release the bond in suit as to prevent liability of the plaintiffs in error for the breaches here complained of ?    2. Are plaintiffs in error insurers of the moneys of the county and liable for their loss regardless of all questions of diligence, skill, and good faith ?

The obligations of the plaintiffs in error were incurred in the light of statutes affecting the question of treasurers' bonds.    They knew that the commissioners were obliged by law to require a new bond in case of the death, removal from the State, or insolvency of any surety upon the bond in suit.    (Rev. Stat., Sec. 1911.)

They had the right to believe that this provision of the law protected them to a large extent against the increase of the burden assumed by each at the inception of the bond with all the sureties solvent.    The law provided that the failure for twenty days after notice to file a new bond vacated the office and made it the duty of the commissioners to appoint a new treasurer.    Thus the period when less than the whole number of the sureties would probably stand responsible for any default was not great.    The matter would then pass over to be borne by the new bondsmen.    In the case at bar one of the sureties became insolvent, and a new bond was given.    The conditions of the new bond were double, binding the sureties as sponsors: first, that Roberts would pay according to law all moneys that might thereafter come into his hands, and second, that Roberts "shall deliver over to his successor in office, or to any other person authorized by law to receive the same, all moneys, books, papers, and other things appertaining thereto, or belonging to his said office of county treasurer."

The point of time of the default as alleged is January 7, 1895.    The default was the failure at that point of time

and thereafter to turn funds over to his successor.    There is no allegation that any breach occurred prior to the expiration of the term of office of the treasurer.    The whole theory of the defendant in error is that all such questions as what became of the money and when, are meaningless. The defendant in error enunciates the proposition that it is nominated in the bond that Roberts shall pay over to his successor, that he failed to do so, and hence the sureties are liable.    Manifestly such a failure, if a breach of any bond, is a breach of the bond filed October 3, 1893.    The defalcation alleged occurred, if at all, after the execution and approval of the new bond.    We also offered to prove by parol, in addition to the force of the circumstances and the record of the Board of Commissioners, that the new bond was actually given and received as a substitute for the old.    If there was any breach of any bond, it was under the circumstances offered to be proven a breach of the new bond, and not of the old.    (State v. Finn, 23 Mo. App., 290.)

We submit, therefore, that the court erred in excluding from the jury the new bond, and the evidence, record, and parol, showing the circumstances and purposes of its execution.

Evidence offered and excluded by the court would have shown that the treasurer deposited county funds in a bank which was then, and for years had been, of excellent financial standing and repute.    That such deposit was required in Laramie County for the reason that in no other way could the funds be as safely or securely kept. That it had been customary with the knowledge of the officers and people of the defendant in error for the treasurers of the county so to keep the funds.    That funds so deposited were lost and are funds here sought to be recovered.    That no negligence of the treasurer or his deputies at any stage, in any way caused or contributed to the loss.

Evidence offered and excluded would also have shown that by law and the obligations assumed by the

county, it was the duty of the treasurer to send $4,800 to New York for the payment of interest coupons. That the only safe way to transmit the funds was the purchasing of exchange and forwarding the same to the place of payment. That Kent was a banker engaged in the business of buying and selling exchange of the kind needed, and was of excellent financial standing and repute. That the treasurer without negligence purchased exchange from Kent for the purpose of sending it to New York as his duty required. That he transmitted it without negligence to New York, where it arrived just after Kent's failure, and was thereby lost. That of the sum claimed by the defendant in error in this suit, $4,800 with interest thereon was the money so lost. That the money was so forwarded by the treasurer for the purpose of discharging his official duty in relation to providing funds at the required time and place for the discharge of the county obligation.

It seems to us that on both branches, the case strongly illustrates the harshness and injustice of the rule of absolute liability contended for by the county. Take for example the matter of sending the draft for $4,800 to New York. This was not only prompted but required by law and his official duty. The offer was to prove that he chose a safe method of transmittal and the only safe method. We know that it is the method chosen by commerce whose power to scent danger is exceedingly keen. The court ruled that no matter how careful, skillful, and diligent the treasurer was in the matter of the transmittal of these funds which his duty compelled him so to transmit, he is liable for their loss.

" In general, all trustees who have the custody of money, such as executors, and administrators, guardians, and receivers, and the like, are held not to be liable for the loss of funds occurring without their fault or negligence, and this is so regardless of the form or character of the bond which they may have given, or the statutes or orders of court prescribing their duties." (State v. Gramm, 7 Wyo., 329.)

"It is also well settled that there is nothing at common law which distinguishes public treasurers or depositaries from any other financial managers or trustees. The absence of any such distinction is recognized in another well-settled doctrine, that public officers, having in their official custody money belonging to others than the public, are not responsible for its loss occurring without negligence on their part." (Ibid.)

Indeed, how it could be held that a court in fixing liability will look to the suitors in the case rather than to the form of the obligation and statutes prescribing duties is doctrine impossible for us to comprehend. We can not conceive how the same language in the obligation under the same statute or order of court prescribing duty can in one case where private rights only are at stake be held to require nothing more than good faith, diligence, and skill, and when public rights are involved, construed to be absolute insurance. It must be conceded that the defendant in error can not here succeed unless such distinction can be maintained between the construction of the same words when private rights are involved, and their construction when public rights are involved. We could understand the reasoning of such courts as would hold that such a distinction in cases where public rights are involved is required by public policy. We can not at all understand those courts where the construction of such bonds and statutes in case of private interests is fully acquiesced in, and the principle laid down, as we have above set forth, where at the same time the court honestly and equitably construes the words in all cases of private rights, and technically and strictly weighs the meaning of the words used where public rights are involved, and reaches a different conclusion as to the meaning of those words from that reached in the case of private rights. All justice and equity cries out against such a method of dealing with rights. The words mean in case of such obligations exactly the same whether private rights are involved or those of public nature. There can be no possible room for the different construction of the same words

used.   If there be difference in the rights in the two cases,
that difference must hinge upon public policy and that
alone.   We will therefore not spend time here in discuss-
ing those cases which place the ruling where public rights
are involved upon the words of the bond.   We grant that
it would be entirely possible for a statute enacted before-
hand to lay down the rules for construing such bonds.   It
would be entirely possible for the Legislature to say in
terms as to all such bonds executed hereafter they shall
be construed to be an insurance by the treasurer and his
bondsmen of the safety of the funds, and not simply a
guarantee of the good faith, diligence, and skill of the
officer.   Illustrations of actual statutes of a similar kind
will be found in the case of Cumberland v. Pennell, 69
Me., 357.   It must be conceded, however, that our Legis-
lature has nowhere laid down any rules of construction
for such bonds.   We have therefore in this State to
guide us in the construction of the bond in suit, first,
words of the bond; second, the meaning of such words as
reached by that lamp of experience, the common law, in
all cases where fiduciary rights and liabilities are involved;
third, public policy.

As we have seen the first two, the words of the bond,
and the construction of such words where fiduciary rights
and liabilities are involved, would decide this cause in
favor of the plaintiffs in error, unless some ground of
public policy shall here be held to make it necessary
that the treasurer and the sureties upon his bond become
insurers of the safety of the funds.   The whole case,
then, as it seems to us, resolves itself into a discussion
of the question, Does public policy so require?   That
question has been decided in the affirmative by several
courts, beginning with the case of the United States
v. Prescott, 3 Howard, 578, and several other deci-
sions in several States.   It will be observed that the
Prescott case is the leading case in favor of the defend-
ant in error.   Indeed, that case evolved a new principle
not theretofore recognized anywhere, and hostile to the

doctrines of the common law. And while in the discussion the court lays stress upon the language of the bond, still, in the light of the common law, that language was not sufficient to authorize the decision rendered, and the court, as if recognizing this fact, plants itself upon a supposed principle of public policy requiring the court to hold strict liability. The cases which follow the Prescott case are some of them upon strict bonds, and some of them upon bonds of the most general character; but in the light of the common law, in neither case, whether the bond was strict in its terms or general, was the consideration reached authorized excepting upon the theory of public policy invoked in the Prescott case. That theory as to the public policy was greatly weakened by the case of United States v. Thomas, 15 Wall., 377, by both the prevailing opinion and the dissenting opinion, and as to the federal courts was entirely destroyed by the enactment by Congress, 14 U. S. Stat. at large, 44, which provides a way of release for public officers where public funds are lost without fault.

The following uphold the right of the officer to show absence of fault on his part: Walker v. Guarantee Asso., 18 Ad. & El., 277; Cumberland v. Pennell, 69 Me., 357; Mechanics' Bank v. Hallowell, 52 id., 545; Thompson v. White, 45 id., 444; State v. Houston, 78 Ala., 576; Peck v. James, 3 Head, 75; State v. Copeland (Tenn.), 34 S. W., 427; York Co. v. Watson, 15 S. C., 1; City v. Mulligan (Cal.), 45 Pac., 337; City v. Woods (Mont.), 49 Pac., 437; Mechem on Off., Sec. 301.

The treasurer was at all times custodian of the funds, and did not by the receipt of taxes and other public funds become debtor to the county for the funds so received. (State v. Foster, 5 Wyo., 199; State v. Gramm, 7 Wyo., 329.)

Sec. 7, Art. XV, Constitution of Wyoming, provides a method whereby the county funds shall be taken from the county treasurer so far as concerns the safe keeping of the funds. The people in their constitution have said such

method "shall" be employed. For present purposes it matters not that the Legislature has failed to obey the constitutional mandate—has failed to enact a law and carry out the provisions of the constitutional requirement. It suffices that the people in their fundamental law have manifested their intention that the matter of the safe keeping of the funds shall be entrusted to hands other than those of the treasurer, hands that might well be chosen over the objection and protest of the treasurer. The intention is very manifest that the banks to which the public funds are so intrusted shall be permitted to use them and make profit out of them. Hence no salary is paid to the banks for their watch-care, but, on the contrary, the banks are to pay for the use, such payment to consist of a sufficient guarantee that the funds shall be forthcoming when needed, and some agreed rate of interest in addition. It would be indeed strange if the people intended that the money should be taken from the control of the treasurer against his will and placed in other hands, and yet that he should be held liable as insurer of the safety of the funds, and to add to the harshness of such view the banks to whose hands the money is to be intrusted are to be permitted to make profit out of the funds by loaning them out and not retaining them in bank and thus putting them out in still third hands without the consent of the treasurer. It may be said that no law has been enacted under the constitutional provision requiring a depositing bank. True, but the people decreed that such law should be enacted, and they have not provided for one measure of liability before and another after the Legislature shall have complied with their decree. The intention is that the law shall be enacted, and the intention as to the measure of the treasurer's liability must be ascertained by remembering that the law at all times presumes immediate compliance with the constitutional mandate. It is therefore clear that the measure of the treasurer's liability should be ascertained by assuming the existence of the proper law for securing the funds in bank. In other words, the public policy announced by the constitution is

that the funds shall remain in the channels of trade to the manifest advantage of the people, and that the persons who make profit from such funds shall be the ones responsible as debtors for their return, and shall give sureties upon such liability, and no announcement is made by constitution or statute of any public policy changing the common law rule of fiduciary liability in the case of the treasurer or his sureties. It seems to us that the results reached in the case of State v. Gramm, supra, are a denial that the doctrine of public policy holds the treasurer an insurer. As in cases where private rights are involved, the courts have held no liability where fidelity, diligence, and skill were exercised, and this without reference to the bonds or the statutes prescribing duties. So the net result of the cases adopting the " new-born doctrine " of public policy is that the treasurer and his sureties are liable as insurers as a matter of public policy, and this without regard to the particular words of the bond prescribing duties. See cases cited by the defendant in error, and see especially Tillinghast v. Merrill (N. Y.), 45 N. E., 375. That the rule contended for by the defendant in error is harsh, if not unjust, is admitted even by the courts that enforce it. The whole argument in favor of such rule is the contention that it may be "wiser to subject the custodian of public moneys to the strictest liability rather than open the door for the perpetration of frauds in numberless ways impossible of detection, thereby placing in jeopardy enormous amounts of public funds constantly passing through the hands of disbursing agents." (Tillinghast v. Merrill, supra.)

The argument that the honest and faithful agent must be mulcted when loss occurs without his fault, lest some fraud might occur and fail of detection, was not sufficient to overcome and crush the natural sense of justice where private rights are involved, and yet the private funds passing through the hands of fiduciary agents are vastly greater in amount than the public funds.

Guardians, executors, and receivers, are often chosen

without any consent of those whose funds they control, while public funds are in the hands of treasurers chosen by the public. The reasons, therefore, for the rule contended for are less weighty in cases of public rights than in those of private rights. The courts that hold harmless the public agent who has brought all fidelity, diligence, and skill, to the discharge of his official duties have the weight of the argument, and every sense of justice within us cries out against the harshness and injustice of the contrary rule. As we have said, the result reached in the Gramm case has declared that no rule of public policy here requires that the State treasurer be held liable in the absence of fault on his part. A principle so just to the public and the officer is equally applicable here.

*Robert W. Breckons*, for defendant in error.

The agreement of the plaintiffs in error in this case appears in the bond. That agreement is very simple. There can be no mistake about its meaning. There exists no necessity for a discussion as to the interpretation or construction of contracts. A bond given by these plaintiffs in error was to be effective under certain conditions; and void if the principal did certain things. Should the principal fail to comply with the conditions of the bond, the bondsmen must pay.

These conditions, as gathered from the instrument, may be classified or enumerated as follows: First. Roberts must faithfully and properly perform the duties of his office. Second. Roberts must pay, according to law, all moneys which might come into his hands as treasurer, and must render a true and just account thereof whenever required by the Board of County Commissioners of the county of Laramie, or by any provision of law. Third. Roberts must deliver over to his successor in office, or to any other person authorized by law to receive the same, all moneys, books, papers, and other things pertaining thereto, or belonging to his office of county treasurer. In this bond, there was an agreement on the part of the

bondsmen that Roberts should pay to his successor all money pertaining to, or belonging to, the office of county treasurer.

What money was thus required to be paid to Roberts's successor? Did the money lost in Kent's bank pertain or belong to the office of county treasurer? Was it an agreement to pay to his successor all money received, and not paid out on orders authorized by law? There can be but one answer to these questions.

Indeed, in the brief of plaintiffs in error it is at least impliedly admitted that this bond contained an absolute promise to pay; the entire argument of counsel being that, because Roberts acted without negligence in the care of the money he should be excused from his absolute promise. Roberts, by his own testimony, failed to deliver to himself as his successor all money pertaining to his office. It appears from his own testimony and the testimony of Mr. Swan that the amount lost in Kent's bank was always carried on his cash books as so much cash. We may therefore take it for granted that plaintiffs in the court below established a default in the conditions of the bond. However, by his pleadings, and by his proffered testimony, Mr. Roberts and his bondsmen sought to show, not that he had paid over to his successor all money pertaining to his office; not that he had accounted for every cent of it, but that a part of it had been lost by reason of a deposit made by him in the bank of Mr. Kent. Was this plea and this evidence admissible. Counsel for plaintiffs in error says that it was, and bases his claim upon the ground that where private interests are involved, words similar to the words here employed bind the person executing the bond to use only diligence in the care of the funds, and that there is nothing to distinguish such a case from a case where public interests are concerned. He further says: "This cause should be decided in favor of the plaintiffs in error, unless some ground of public policy shall here be held to make it necessary that the treasurer and the sureties upon his

13

bond become insurers of the safety of the funds.'' The whole case, then, as it seems to us, resolves itself into a discussion of the question, Does public policy so require?

These bondsmen having entered into a positive agreement that Roberts should pay, it seems to us that there is another question presented, namely, Why should they not be called upon to keep their agreement? However, we are disposed to accept the question put by counsel for the plaintiffs in error, believing that public policy, in the case here, does dictate that no such excuse should be permitted.

The loss in this case is not one occasioned by robbery nor by theft, nor by the act of God or the public enemy. It is a loss occasioned by Kent. Who selected Kent as the custodian of the money? Who placed it in his power to lose the money? It was not the people who did this, but Roberts. Roberts and not Kent, was selected by the people as the custodian. Kent was selected by Roberts and not by the people.

The money thus being lost by reason of the default of a man of Roberts's selection, in all reason, who should bear the loss, Roberts or the people?

Coming to the question of public policy, let us see just what a decision in favor of the plaintiffs in error in this case would mean, and what it might lead to. The relief of Roberts in this case would mean that an officer, selected by the people as the custodian of the money, might place that money in a bank, operated by his bondsman, who was not selected by the people, and that, should the money be lost, neither the officer nor the bondsman who lost the money, would be liable on the bond given to secure the preservation of the money. Now, under such a holding, would it not be a very easy matter to defraud the public? A man might be selected as county treasurer, and select as his bondsmen people who are engaged in the business of bankers. It would be a very easy matter to simulate a failure of that bank, and a loss of the funds of the county. It would be within the power of half a dozen people to loot the public treasury. To put the

matter more plainly, a decision in favor of Roberts and his bondsmen would be a temptation to every custodian of money in the State of Wyoming to steal from the public.

Public policy may not require a treasurer to be held responsible for losses occasioned by the act of God or of the public enemy, or by robbery or theft; but it does require that he should be held responsible for losses occasioned by a failure of a bank selected as a place of deposit by the officer, and maintained by his principal bondsmen. It is not thus that the money paid by the people for the maintenance of our courts, our public schools, and our public institutions should be lost. The idea that a treasurer should be excused for loss of money in the bank of his principal bondsman is as shocking to a sense of justice as is the proposition that he should be responsible for money lost in an earthquake.

The great weight of authority is with the defendant in error in this case. U. S. v. Prescott, 3 How., 578; U. S. v. Dashiel, 4 Wall., 182; U. S. v. Keehler, 9 id., 83; Boyden v. U. S., 13 id., 17; Bevans v. U. S., 13 id., 56; Commonwealth v. Comly, 3 Pa. St., 372; Alston v. State, 92 Ala., 124; State v. Croft, 24 Ark., 550; State v. Wood, 51 id., 205; Gartley v. People (Colo.), 49 Pac., 272; Thompson v. Board, 30 Ill., 99; Halbert v. State, 22 Ind., 133; Morbesk v. State, 28 Ind., 86; Linvill v. Township, 72 Ind., 495; Taylor v. Morton, 37 Iowa, 553; Hancock v. Hazard, 12 Cush., 112; County v. Jones, 18 Minn., 205; Board v. Jewell, 44 id., 429; Griffin v. Board, 15 So., 107 (Miss.); State v. Powell, 67 Mo., 396; State v. Moore, 74 Mo., 416; State v. Nevin (Nev.), 7 Pac., 650; Inhabitants v. McEachron, 33 N. J. L., 339; Tillinghast v. Merrill, 151 N. Y., 140; Havens v. Lathere, 75 N. C., 505; State v. Harper, 6 O. St., 608; Bailey v. Commonwealth (Penn.), 10 Atl., 764; Nason v. Poor Directors, 126 Pa. St., 445; Boggs v. State, 46 Tex., 10; Fairchild v. Hedges (Wash.), 44 Pac., 126; Bush v. County, 48 Neb., 3; Rose v. Douglass (Kan.),

43 Pac., 1046; U. S. v. Watts, 1 N. M., 553; Omro. v. Kaine, 39 Wis., 468.

Independent of the high character of the court, and of the great learning of the judges, these decisions of the Federal Supreme Court should have great weight upon this particular question. Had this proposition arisen prior to the year 1890, when Wyoming was admitted as a State, there could not have been the slighest question as to the result. The Supreme Court of the United States was then our court of last resort. That court had declared the duty of public officers, and fixed the responsibility of sureties upon official bonds. By a provision of the schedule to the constitution of the State of Wyoming, all laws not repugnant to the constitution, were continued in force. By virtue of this provision, all laws with relation to the office of county treasurer were adopted, and surely adopted with such construction as had been placed upon similar laws by the Supreme Court of the United States. The bond he was compelled to give, under and by virtue of these statutes, was a bond which this court of last resort had said made him an insurer of the funds. The people of Wyoming, in adopting these statutes, adopted them with this construction, and when they continued in force, the law requiring the giving of a bond by a county treasurer, continued in force the rule of the Supreme Court of the United States that under such a bond the officer became an insurer.

If this be true, these decisions should turn the balance in favor of upholding the rule of absolute responsibility. For when the Legislature of 1891 prescribed a form of bond to be given by a county treasurer, they did not go beyond the territorial statutes. Compare the provisions of Sections 1 and 2 of chapter 45 of the laws of 1891 with Section 1821, R. S. Wyo., and we find that the form of the bond fixed by the State Legislature was exactly that prescribed by the territorial Legislature — the State Legislature used language which had been used by the territorial Legislature. When adopted by the territorial Legis-

lature it made the treasurer an insurer of the funds; when adopted by the State Legislature did it mean less?

The following Sections of the Revised Statutes cover the duties of county treasurers. Sections 1826, 1832, 1834, 1836, 1838, also Laws, 1890–91, Ch. 45, Secs. 2, 3, 5; Laws, 1890, Secs. 51, 52. From these statutes the following is to be gathered as part of the duties of that officer.

First. He shall keep a just and true account of the *receipts and expenditures* of all moneys coming into his hands by virtue of his office, and when settling with the board, must exhibit *vouchers* for all expenditures. Second. He must pay to the State treasurer all moneys received by him on account of State taxes *in the same kind of funds* in which they shall be received. Third. He must receive from the county officers moneys belonging to the county *in the same funds* they were received by such officers. Fourth. He must keep a cash book in which must be entered every sum of money paid by him by virtue of his office, the date of the payment, the name of the person paying the same, the account upon which the money was paid, and *the nature of the funds paid to him*. Fifth. He must give a bond conditioned as required by law. Sixth. He must act as collector of taxes. Seventh. He must receive all moneys belonging to the county and State. He must pay out no money *except on orders or warrants* issued by order of the board of county commissioners. Eighth. He must not convert the money to his own use, or to the use of any other person; nor invest it; *nor exchange it for other funds* except as allowed by law. Ninth. He must not fraudulently refuse to pay over to his successor *any money which may have come into his hands* by virtue of his office.

Certainly the duties of a county treasurer, as outlined above, do not contemplate the deposit of funds in a bank by him. If he deposits money in a bank on general deposit he can not keep it in the same kind of funds received. These various statutes make the treasurer, and

not a private banker, the custodian of the funds. When the treasurer deposited the money of the county with the banker, he found no authority in the statutes of the State for so doing; but did find, in these statutes, as we believe, an absolute denial of his right so to do.

So much for the statutes of the State with relation to the duties of county treasurer. As is intimated in the Gramm case, they are proper subjects for consideration in determining what constitutes a breach of the bond by the county treasurer. Let us now glance for a moment at the statutes with relation to the bond itself. Section 1 of Chapter 45, Laws 1891, provides that he shall give a bond, while Section 2 of the same chapter fixes the terms of the bond.

In Section 3 is the only expression of the Legislature to be found anywhere, as to what constitutes a breach of the bond. It provides that the bond given by the treasurer shall cover any and all failures on his part, as collector of taxes, to pay over to the proper person any moneys by him *received* as collector of taxes. In other words, the Legislature said that the language employed in the bond should receive a construction broad enough to cover any failure on the part of the county treasurer as collector of taxes to pay over all moneys *received* by virtue of his position as collector.

We may take it for granted, then, that the county treasurer, as collector, must, under the terms of the bond, pay over all moneys *received* by him as collector, to the person entitled thereto. No exception whatever is made to loss by a deposit in bank.

Shall the same language receive a less rigid construction as to money held by the officer as county treasurer? Section 7 of Art. 15 of, the constitution, if it is to be considered at all, does not support the case of plaintiffs in error. It should, we believe, be considered, and its effect is to exclude all banks as depositaries of public money except such as should give security as provided by law. We maintain that the constitutional provision prohibits the deposit of public moneys in a private bank.

So far as Kent, who is one of the sureties, is concerned, we take it that as an abstract proposition he must be held liable under the terms of the bond in suit.   He was the banker with whom the money was deposited.   One motion only for new trial was filed, as to all but one of the defendants.   Kent was joined in the motion with the others, and as it was properly overruled as to him, the others joining in the motion can not complain.   (4 Wyo., 302.)

The fact that new bonds were given after the loss of the money is immaterial.

Where a statute provides that an officer who has already given a bond and is exercising the office, may be required to give a new bond, but does not make provision for the discharge of the sureties on the old bond, the giving of such new bond does not, as a general rule, discharge the sureties on the old bond.   The sureties on the second bond given in compliance with such a statute would not be liable for any moneys not received by the officer subsequent to its execution.   (People v. Curry, 59 Ill., 40; Hutchcraft v. Shrout, 1 T. B. Mon., 206; 2 Brandt on Suretyship, 540; Com. v. Cocks, 36 Pa. St., 442; Jones v. Blanton, 6 Iredale Eq., 115; Conover's Case, 35 N. J. Eq., 108; Postmaster v. Munger, 19 F. C., 1099; Allen v. Stow, 61 Ind., 275; School Dist. v. Mc Donald, 39 Ia., 565; Studebaker v. Johnson, 41 Kan., 326; State v. Alsup, 91 Mo., 173; Morgan v. Smith, 95 N. C., 403; Township v. Morris, 91 Ia., 198; Lloyd v. City, 82 Tex., 251; Meyers v. U. S., 17 Fed. Cases, 1120; Vivian v. Otis, 24 Wis., 521; U. S. v. Boyd, 15 Pet., 202; Farrar v. U. S., 5 id., 373; U. S. v. Lynn, 1 How., 110; U. S. v. Executors, 1 id., 250.)

Potter, Chief Justice.

From the admitted facts in this case it appears that John Roberts, who had been duly elected county treasurer of Laramie County for the term of two years commencing on the first Monday in January, 1893, before entering upon the discharge of his duties, presented his official bond signed by himself and the other plaintiffs in error as sureties (excepting Max Idelman, administrator, who stands in the place of the decedent, Abram Idelman,

one of the sureties) in the penal sum of one hundred fifty-five thousand dollars, which bond was then approved by the board of commissioners.   The condition of the bond is as follows: "Now, therefore, the condition of this obligation is such that if the said John Roberts and his deputies, and all the persons employed in his office, shall faithfully and promptly perform the duties of said office, and if said John Roberts shall pay, according to law, all moneys that shall come into his hands as treasurer, and shall render a just and true account thereof whenever required by the board of county commissioners of the county of Laramie, or by any provision of law, and shall deliver over to his successor in office or to any other person authorized by law to receive the same, all moneys, books, papers, and other things appertaining thereto, or belonging to his office of county treasurer, the above obligation to be void; otherwise to remain in full force and effect."

For an assignment of a breach of the bond, the petition alleges that the said Roberts did not, as treasurer, faithfully and promptly perform the duties of the office, and did not pay over, deliver, or transfer to his successor in office all moneys which he had received and collected and which came into his hands as such treasurer, and that he did not render a just and true account thereof, and did not deliver to his successor in office, nor to any other person authorized by law to receive the same, the sum of twelve thousand six hundred and forty-two dollars and thirty-three cents, appertaining to and belonging to his said office of county treasurer, which moneys were the property of the plaintiff, and had come into the hands of said Roberts by virtue of his office as county treasurer, and which moneys it was his duty to pay over to his successor in office on the 7th day of January, 1895.

Upon the trial the jury were instructed to return a verdict for the plaintiff, the defendant in error here, for the sum of $12,642.33, with interest at eight per cent per annum from January 7, 1895, and in accordance with such instruction a verdict was returned for $15,999.56.

Motion for new trial was made and overruled and judgment rendered upon the verdict. The case comes to this court on error.

1. We will first consider the errors assigned in relation to the refusal of the court to admit in evidence certain new bonds given by the said treasurer during the same term of office.

The answer alleged as separate defenses, the giving of two new bonds on October 3, 1893, and October 3, 1894, respectively, in pursuance of orders made by the board of county commissioners, which bonds were alleged to have been respectively given and accepted as substitutes for previous bonds; and it was alleged that upon the giving of the first of the new bonds the sureties on the original bond were released from all acts, misconduct, or defaults thereafter occurring; and further, that none of the defaults set forth in the petition occurred, if at all, prior to the acceptance of such substituted bond.

On behalf of the plaintiffs in error the said new bonds, together with the records of the board exhibiting the call therefor, were offered in evidence, but, upon objection, were excluded.

They are incorporated in the record and were doubtless examined by the trial court to determine their admissibility. It appears that they were given on the respective dates mentioned in the answer, contained like conditions as the bond in suit, and were each given for the sum of one hundred and twenty thousand dollars.

There were, therefore, three bonds furnished by the treasurer during the term of office covering the period of two years commencing in January, 1893, and securing the performance of the general duties of the office. The first was given at the beginning of the term, and is the one upon which the right to recovery is predicated in this action. The second was required on account of the insolvency of one of the sureties upon the first. The death of a surety upon the second occasioned the call for the third. The statutory authority under which the new

bonds were required is found in Section 1911 of the Revised Statutes of 1887, and reads as follows: "If at any time the sureties, or any of them, upon any official bond, shall die, remove from this State, become insolvent, or from any other cause cease to possess the qualifications required by this chapter, the board of county commissioners shall require the officer giving such bond to give a new bond, with sureties as are required by this chapter."

The statute contains no express limitation upon the obligation of the old or former bond. It is silent in that particular. There is another provision of the statute which affords an opportunity to sureties upon a treasurer's bond to ask for and obtain a discharge from further liability; and, when on account of such request a new bond from the officer is required, such original sureties remain liable only for the official acts from the time of the execution of the original bond to the filing of the new, or the expiration of the time allowed therefor. Rev. Stat. 1887, Secs. 3042, 3043.

Counsel for the county in the case at bar contends that under the statute and circumstances under which the new bonds in question were given, the sureties upon the original bond are not released from any liability, but that the bond continues in force throughout the official term, and bound for all acts and delinquencies occurring after as well as before the execution of a new bond.

On the other hand it is insisted that the original sureties are discharged from liability from defaults arising subsequent to the giving of the new bond, and that the latter is taken as a substitute for the bond previously given. Hence it is urged that as the default alleged is the failure to pay over to a successor in office, and such default occurred, if at all, after the execution of the new bonds, the original sureties can not be holden therefor.

We do not regard it as material to the present controversy whether or not the bond sued on continued in force so as to cover defaults or misconduct respecting

money which came into the treasurer's hands for the first time after the execution and acceptance of the new bond, or even money received by him, prior thereto, but actually remaining in his hands when the new bond took effect.    Neither is it necessary or proper to decide whether the sureties upon either or both of the new bonds are liable for the default alleged in this case, or whether in case of a recovery against the original sureties they would, upon payment, be entitled to contribution from the sureties on the other bonds.

It clearly appears from the evidence that prior to July 20, 1893, the treasurer, Roberts, had deposited certain public moneys belonging to the county in the bank of Thomas A. Kent, which bank failed on or about that date while some of the moneys remained there on deposit; also that such moneys, which constitute the principal of the amount sued for, did not at any subsequent time reach the hands of the treasurer, and that he did not pay the same to his successor in office.    When asked as a witness if he had not lost $12,642.33 of the money which had come into his hands as treasurer, which the county had never received, he answered, "There is that amount that has not been paid to the county from Kent's bank," and he testified that he did not pay that over to himself as his own successor.

When the State examiner made an examination of the treasurer's books and accounts in 1894, the latter reported to him that of the cash shown by his books $14,153.98 was in the shape of a claim in the Kent bank, and upon a subsequent examination it was shown that by the payment of dividends, said claim had been reduced to something over $12,000.

The original bond is at least clearly holden for the acts of the treasurer during the period intervening between its execution and acceptance of the new bond; and upon the facts above noted, the said original bond is bound, and the sureties thereon are liable, for whatever the responsi-

bility of the treasurer may be for the loss of the money occurring in July, 1893, when said bond was the only one in existence.

Whatever difficulty may seem to be in the way of a correct solution of the present question, arises from the character of the default or breach alleged, and the time when it is charged to have occurred; viz., the failure to pay the money to the successor of Roberts at the expiration of his term, after another bond had been required and given.

It is, however, apparent that the county would suffer no damage on account of the loss of the money by the bank's failure, and probably the cause of action therefor would not accrue until it should become the duty of the treasurer to pay out or dispose of the money according to law, and he should fail in the performance of that duty, for, prior to such time it might have been replaced. According to the pleadings and evidence, the time for such payment or disposition did not arrive until the induction of a successor in the office. The liability of the plaintiffs in error upon their bond did not, in any event, cease until the money received by the officer under it had been accounted for in some mode recognized by the law. Whether in case all the money received by the treasurer during the period of the first bond, and before the execution of the second, had been either duly paid out or disposed of as by law required, or actually remained in his possession after the execution of the second bond, would amount to such an accounting as to release the sureties upon the original bond, we do not care now to decide. The money sought to be recovered was not in his possession at any time after the date of the second bond, and he did not pay it out as by law required. If, therefore, he is not in a position to be exonerated from the loss, he has not accounted for it in any manner.

Although it would probably have been better pleading to have charged the officer with the duty of safely preserving the public money from loss, and alleging that it had been lost in July, 1893, under such circumstances as

to render him responsible therefor, and then to have averred the failure to pay the same to his successor, thus showing that the default had become complete, and that a damage and cause of action had accrued; we are of the opinion that upon the pleadings as they stand, and the evidence adduced, the county is entitled to recover upon said bond under the breach assigned, if the duty was incumbent upon the officer to pay or deliver the money aforesaid to his successor.

Technically, it is true, that the breach is grounded upon a failure of duty occurring after the giving of the new bonds, but the proof establishes that such breach was the direct result of acts and circumstances occurring prior to the giving of the new bonds.  The bond secured a proper disposition of the funds which should come into the hands of the treasurer, and if he was under an obligation to replace the money in question and pay it out or deliver it for the benefit of the county, he defaulted in that obligation, and it matters not that before the time for fulfilling that obligation his further acts were secured by other bonds given during the same term of office.  The following are some of the authorities sustaining these views: Yost v. State, 80 Ind., 350; Conover's case, 35 N. J. Eq., 108; State v. Drury, 36 Mo., 281; County of Mahaska v. Ingalls, 16 Ia., 81; State v. Moses, 20 S. C., 465; State v. Berning, 6 Mo. App., 105; Lloyd v. City of Ft. Worth, 82 Tex., 249; State v. Lackey, 3 Ired., 25; Morgan v. Smith, 95 N. C., 396.

We do not regard the case of State ex rel. v. Finn, 23 Mo. App., 290, cited by plaintiffs in error, as in point. The decision in that case, which was a suit upon a second bond, was based upon the fact that an intention contrary to the general rule was manifest by the terms of the bond, and rendered the sureties responsible for the officer's conduct during his entire official term, thus covering that portion of his term preceding the bond as well as subsequent thereto. The proof offered respecting the new bonds was therefore properly excluded.

2. The principal contention in the case arises out of the defense that the moneys sought to be recovered were lost without any fault or negligence on the part of the treasurer, and was not due to any misconduct on his part.

The evidence of the defendant in error, the plaintiff below, had disclosed that public moneys had been received by the treasurer and deposited in the bank of Thomas A. Kent, at Cheyenne, and that $12,642.33 thereof had been lost by reason of the failure of said bank in July, 1893.

On behalf of the plaintiffs in error, evidence was introduced showing the previous excellent standing and reputation of the bank as a place of deposit, the high character and standing, good business habits and ability of the banker, and the want of knowledge in the community of his approaching insolvency. A motion to strike out such evidence was sustained and plaintiffs in error excepted thereto. Several questions were then propounded to certain witnesses, and several offers of proof were made, all of which were objected to, the objections sustained, and the exceptions preserved. Among such offers following respectively questions relating thereto, may be mentioned the following, stating the substance thereof only : That the value of the banker's property, at the time of his assignment, at the value which the same had maintained for years, was not less than one hundred thousand dollars in excess of all his liabilities; that prior to the assignment his bank business had been profitable; that his original absolute capital put into the business by himself was one hundred thousand dollars; that, outside of his banking business, he had, at the time of the assignment, not including his capital in the bank, nor any moneys which went into the bank, in any way, by deposits or otherwise, other property which had a value of not less than two hundred thousand dollars; that his failure was caused solely by a sudden and unprecedented panic such as this country had never before seen, and such as could not have been reasonably anticipated; that the custom of depositing public funds in a bank by the treasurers of Laramie County was a reasonable one, and was necessary for the safe keeping of the

funds, and that there was no other way whereby the funds belonging to the county could be as safely or as securely kept as by depositing them in the manner in which they were deposited by the treasurer, Roberts; that the treasurer had exercised all possible diligence as treasurer in the preservation of the funds sued for, and that no negligence in any degree whatever on his part as treasurer either caused, or in any degree whatever contributed to, the loss of the money here sued for, or any part of it.

It was proven that the moneys in question were deposited with other public moneys in the said bank in the name of John Roberts as county treasurer, and were not mingled with any private funds of the treasurer, and that the banker knew when deposited that they were moneys of the county.   The custom of keeping public moneys in that manner for more than twenty years by county treasurers was admitted in the pleadings.   The court refused to admit the evidence.

The theory of the plaintiffs in error is that the treasurer and his sureties are not liable for the loss of funds without fault or negligence on his part.   On the other hand it is contended that the bond is absolute, and admits of no defense of diligence, faithfulness, skill, or honesty; but that under the statutes and bond, the treasurer is constitued an insurer of the safe keeping of the public funds intrusted to his care.   This view was adopted by the trial court, and led to the exclusion of the testimony and offers respecting the treasurer's honesty and diligence.

The judicial decisions of this country are not harmonious concerning the character of the responsibility assumed by public treasurers.   Upon the general question there exists a direct conflict, a majority of the courts, however, adhere to the doctrine of strict liability, and that the officer is not to be exonerated by any consideration of honesty, diligence, and faithfulness in the case of the loss of public moneys while in his hands unless, indeed, the loss shall have been occasioned by the act of God or the public enemy.   A respectable minority refuse to accept

that doctrine which is by all admitted to be a harsh one. The various reported cases upon this question further illustrate the divergence of judicial opinion by the respectable number of dissenting judges representing both sides of the controversy.

It is not a new question in this court, but had our very careful consideration, and was quite fully discussed in the case of State v. Gramm et al., 7 Wyo., 329, where the authorities were cited and many of them reviewed both in the majority and dissenting opinions. I do not believe that any decision up to that time had escaped our observation, notwithstanding that the learned judge who wrote the opinion in the recent case in Oklahoma, Van Trees v. Territory, 54 Pac., 495, in alluding to the Gramm decision, states that we made no reference to the Colorado case of Gartley v. People. The learned judge is mistaken, as the case aforesaid was cited and referred to more than once in the majority opinion, and also in the dissenting opinion, and Colorado was mentioned as adopting the strict rule. He is also mistaken in the reasons which led to our conclusion in the Gramm case. So far as the general rule is concerned, the Oklahoma court was bound by the decisions of the Supreme Court of the United States, its court of last resort, wherein the strict doctrine was given birth, although in the application of the rule the Oklahoma court has gone as far as any other and enforced it respecting a bond much weaker in its terms and conditions than that passed upon in the leading case of U. S. v. Prescott, 3 How., 578, or in any other case before the United States Supreme Court.

In view of our comparatively recent decision in State v. Gramm et al., supra, we do not consider it either necessary or advisable to again cite or review the authorities. Nor do we consider it essential to again enter upon any elaborate discussion of the general question involved. It will be sufficient, I think, to restate briefly some of the legal propositions affecting the matter, which perhaps may be as well done by quoting from the Gramm case a

statement of some of our conclusions then reached, and which agree with our present views.   After showing that as to the bonds of executors, guardians, receivers and the like, the doctrine of strict or absolute responsibility had never found lodgment in the jurisprudence of this country, and that in respect to bonds of public officers the doctrine was not applied or enforced in case of the loss of moneys belonging to others than the public, we said regarding said rule of strict liability, as follows: "That principle is that, although the officer is a bailee, he has entered into a contract, with sureties, positively engaging to do something.   The bond may fully express that engagement, or it may be aided by the statutes which prescribe the duties agreed to be performed.   Finding a positive and solemn agreement, subject to no exception stated in the bond or statutes, to distinguish between a bond in such case, and bonds in other cases to which reference has been made, the courts resort to the matter of public policy, which they hold requires that the absolute agreement or condition shall not be relaxed by any consideration of care or faithfulness, honesty, or skill, which may have been displayed by the officer. .That public policy is held to arise, and only to arise out of the possibility of fraud, and simulated defenses which public depositaries and their sureties could and would interpose, if any defense of lack of negligence or fraud on the officer's part is to be permitted.   As was stated in an earlier part of this opinion public policy is not invoked to alter any law of bailment.   It does not act upon the common law obligations of a bailee, but is effectual only to keep the official strictly and absolutely to his bond and the conditions thereof.   It is universally recognized and so stated in Boyden v. U. S." (13 Wall., 17) "that virtute officii, the officer is not an insurer, but he may make himself so when he enters into a solemn obligation by contract.   Such an obligation has been found to exist in bonds, and under statutes supplemented by bond, which require the depositary of public funds to keep them

safely, or to pay over to his successor, or to some other officer, all moneys which he shall have officially received, or to pay over all moneys belonging to his office, or language of similar, but as strong, import." * *. * "It is held that the condition of the bond in either event would be broken if the officer did not, in fact, pay over all moneys officially received by him, or did not keep the funds safely, or had failed to pay over all the money belonging to his office, as the case might be."

In the Gramm case a majority of this court held that we were not required to assent to or dissent from the cases which refused to adopt the strict rule, but that the bond in that case did not bring it within the rule of strict liability.

. In the present case, however, it is earnestly insisted that the bond is one which by its terms and conditions calls for the application and enforcement of such rule, and it must be admitted at the outset that it does contain a condition which has been held in a very few of the later cases to constitute the officer an insurer, notably in Colorado, Gartley v. People, 49 Pac., 272, and in Oklahoma, Van Trees v. Territory, supra.

That condition is as follows : "And shall deliver over to his successor in office, or to any other person authorized by law to receive the same, all moneys, books, papers, and other things appertaining thereto, or belonging to his office of county treasurer."

Counsel for defendant in error in his brief inquires, "Did the money lost in Kent's bank pertain or belong to the office of county treasurer ? " "Was it," referring to the condition, "an agreement to pay to his successor all money received, and not paid out on orders authorized by law ? "

The two inquiries are not identical. Neither are they necessarily entitled to the same answer. The money lost in the bank undoubtedly pertained and belonged to the office of county treasurer at the time it was so lost. Whether the agreement of the bond amounted to a prom-

ise to pay to the successor all money received and not paid out on orders authorized by law depends upon a consideration of the question whether that money so lost continued to constitute money pertaining to the office in the sense in which those words are employed in the bond; and the answer to that question depends upon the character or degree of the responsibility of the treasurer for the safe keeping of the money, and whether if such responsibility is not absolute, the circumstances are such as to exonerate him from liability for said loss.   It strikes us as illogical and unreasonable to say that when an officer handling public funds has solemnly contracted to keep them safely that he thereby becomes an insurer of their safety, and then to hold that without such an agreement one will be imported into a covenant to deliver all money belonging to the office to a successor in office. Such a condition, which has a very obvious purpose, is thereby accorded an exceedingly comprehensive significance.   It is thereby constituted the criterion of the degree of care or the measure of the responsibility resting upon the officer.   Now, to us, it is clearly apparent that such a condition would be entirely consistent with a provision of law or a separate condition of the bond limiting the official liability to cases wherein he can not establish his diligence, faithfulness, skill, and honesty, and when coupled with such a provision of law or such a condition of the bond the particular agreement or condition under consideration could not be held susceptible to the construction given it by a few courts for the purpose of applying the rule of strict liability.   We are unable to find the measure of responsibility in the condition relied on.   Its effect and the extent of the promise contained within its terms depend upon the duties devolving upon the officer in respect to the care of the funds in his hands, and the nature of the liability to be derived therefrom. If neither the bond otherwise nor the law has required that he shall keep the money safely so as to admit of no defense of diligence or skill, we do not believe the court is

warranted in finding, or that the law requires it to find
such a duty, or such a liability, in a condition to deliver
all moneys, papers, etc., belonging to the office to a suc-
cessor in the office.   In that respect we find ourselves
unable to agree with a few of the courts which follow the
lead of the case of U. S. v. Prescott, supra.   In our
judgment those courts have unduly enlarged or extended
the doctrine.   In a recent enactment of our Legislature in
regard to official bonds — passed since the Gramm deci-
sion — a form of bond is prescribed for public treasurers,
the part material to this point being as follows :   "And
shall with all reasonable skill, diligence, good faith, and
honesty safely keep and be responsible for all funds com-
ing into the hands of such officer by virtue of his office;
and pay over without delay to the person or persons
authorized by law to receive the same all moneys which
may come into his hands by virtue of his said office."
Thus a promise to pay over all moneys to the person
authorized by law to receive the same is associated with a
condition to keep the moneys received by him with all
reasonable diligence, skill, good faith, and honesty.

We do not undertake at this time to construe the late
enactment.   Such a course on the part of the court would
be highly improper, but if said enactment imposes upon
the treasurer the duty only of exercising diligence, skill,
good faith, and honesty in the care of public moneys, it
amounts to an expression of the policy of this State,
which, hereafter at least, would control the judicial branch
of the State government.   Further than that, in view of
the failure of the law heretofore, in respect at least of
some public treasurers, to use language with reference to
their duties sufficient to plainly constitute them insurers
of the public funds, the late statute would seem to tend
strongly in the direction of a denial of the previous exist-
ence of a policy which would exclude a defense of good
faith, skill, honesty, and diligence when an officer and
his sureties are confronted with the loss of such funds.

In the bond before us there is no express covenant to

keep safely the moneys received.   There are several provisions of law referring specially to the office of county treasurer.   He is required to receive all moneys belonging to the county and State, and all moneys which may be by law directed to be paid to him, and to pay out the same only on the orders or warrants issued by the board of county commissioners, as prescribed by law, except where special provisions for the payment thereof shall be otherwise made by law.   L. 1891, 178.   He is required to keep a just and true account of the receipts and expenditures of all moneys which shall come into his hands by virtue of his office as treasurer.   Id.   The book or books in which are entered such account is to remain open at all times for the inspection of the board of commissioners or any member thereof, and to all county and State officers, or any citizen desiring to inspect the same, and at the annual board meeting in January, or at such other time as the board may direct, the treasurer is required to settle with the board his account as treasurer, and, for that purpose to exhibit to them all his books and accounts and all the vouchers relating thereto, to be audited and allowed; also, to make a report at each regular meeting of the amount received and expended during the intervening time if so required.   R. S., 1887, Sec. 1826.   It is required that the treasurer shall pay over to the territorial (State) treasurer, all territorial (State) taxes and other moneys received from the county collector on account of the territory (State), in the same kind of funds in which received, and in so paying the same is to make a sworn statement that he has paid the same funds in kind as received by him, and has not exchanged or bartered any of the moneys, coin, bank bills, treasury notes, or other currency received by him on account of the territory for any auditor's warrants, territorial (State) scrip or other certificates of indebtedness of the territory, nor caused nor permitted the same to be done, and that all warrants or other certificates of indebtedness of the territory (State) delivered by him to the treasurer, were received by him

from the county collector in payment of territorial (State)
taxes, of other moneys due the territory (State).     Id.,
Sec. 1832.

Considerable stress seems to be laid upon this pro-
vision by counsel.    A word in passing, therefore, with
reference to it.    It is evident that it is not intended to
and does not relate in any manner to the degree or char-
acter of the responsibility of the treasurer for the safe
keeping of the public funds.    Its sole object was to secure
to the territory and later the State, the proper payment to
it of moneys paid to the treasurer on account of the terri-
tory or State.    The county was and is made responsible
to the territory and State for territorial and State taxes
levied upon property within the county, which were and
are required to be collected by the county collector the
same as county taxes.    The identical money received was
not required to be paid to the territorial or State treasurer,
but only the same money in kind.    If one kind of money
allowed to be received should differ from another in
value, the territorial or State treasury was not to be made
to suffer by being paid in money of the poorer quality.
If it ever subserved any useful purpose in the direction of
that object, it has obviously been of no consequence for
many years.    The particular matter, however, clearly
designed to be covered had relation to territorial and
State warrants which were formerly receivable for terri-
torial and State taxes.    They have not been so receivable
since 1895.    The provision was calculated to prevent the
treasurer from buying or speculating in territorial or State
warrants with territorial or State money, and turning the
same in for taxes paid to him in money.

With the exception of certain provisions of the criminal
code, the above are all the statutory requirements concern-
ing the office and duties of county treasurer as such which
affect in any way the question in controversy.

The provisions of the criminal code are as follows:
" Whoever being charged or in manner intrusted with
the collection, receipt, safe keeping, transfer, or disburse-

ment of any money, funds, securities, bonds, choses in
action or other property belonging to or under the con-
trol of any county, school district, city, or town, converts
to his own use, or the use of any other person, in any
manner whatever contrary to law, or uses, by way of
investment in any kind of property, or exchanges for
other funds except as allowed by law, any portion of such
money, funds, securities, bonds, choses in action, or
other property, is guilty of embezzlement, and shall be
imprisoned in the penitentiary not more than twenty-one
years." Laws 1890, Ch. 73, Sec. 51.

"Any county treasurer " * * * "who shall fraudu-
lently fail or refuse, at the expiration of the term for
which he was elected or appointed, or at any time during
such term when legally required by the proper person or
authority to account for, deliver, and pay over to such per-
son as may be legally entitled to receive the same, all
moneys, choses in action, or other property which may
have come into his hands by virtue of his said office, shall
be deemed guilty of embezzlement, and shall be impris-
oned in the penitentiary for any period not more than
five years." Id., Sec. 52.

None of the above provisions of the statute expressly
require the treasurer to safely keep the public moneys, or
expressly constitute him absolutely responsible for their
safe keeping, or expressly prescribe that he shall pay over
to his successor all moneys which he shall have received
and not paid out upon orders or warrants. The implied
effect of the criminal sections — if any — upon that matter
will shortly be considered.

We entertain no doubt whatever that one of the duties
inherent in the office is to keep the public funds safely.
That is a common law or implied duty. But no court has
held that such a duty unless found to have been expressly
contracted for by bond constitutes him an insurer of their
safety. It is true that the bond in the case at bar secures
the faithful and prompt discharge of all the duties devolv-
ing upon the treasurer, as well such as are implied as

those which are expressed in the bond itself or the statute, but the distinction, as pointed out in the Gramm case, is this: The implied or common law obligation of safe keeping is not an absolute one, and although the officer is said to be charged with the safe keeping of the funds in his hands, the consequences of such an implied duty are such that, in reality, the obligation is to keep the moneys with all proper and reasonable skill, diligence, faithfulness, and honesty.

Our statutory provisions upon the subject are quite similar to those of Colorado, and while a majority of that court were able to find in them and the bond sufficient to authorize and require the enforcement of the strict rule, I believe the views expressed in the dissenting opinion of Mr. Justice Goddard to be more in harmony with the principles of law governing such cases and the reasons underlying them. In his opinion he said, "The question before us depends upon whether the provision of the statute of this State prescribing the duties of county treasurers, impose an absolute duty to pay over the public moneys received by them." And he failed to discover in them or in the condition of the bond, similar to the one in suit, any such absolute requirement. Gartley v. People, supra.

It may be that, as was said in the Prescott case, "public policy requires that every depositary of public money should be held to a strict accountability," but that court did not, in my judgment, intend to assert that the depositary should be held to a stricter accountability than is prescribed in the bond or statute. Nor is there any reason, although possibly there may be some judicial authority, for such an assertion. To confine the officer strictly to his bond is one thing. To import into it some agreement which is omitted, and then hold him strictly to that is quite another. No element of public policy requires or authorizes the latter.

The treasurer is also ex-officio collector of taxes. Formerly the sheriff was ex-officio collector, and the provisions of the Revised Statutes with reference to certain

duties of the treasurer as collector as originally enacted, related to the sheriff as collector, but in the process of revising the commission having that matter in charge substituted for "sheriff" the "treasurer." This explanation is suggested to show that such duties were not connected with the treasurer's office as such, but followed the office of collector of taxes and concerned that office exclusively. Among those duties may be mentioned the requirement for the keeping of a cash book, in which shall be entered every sum of money paid to him by virtue of his office with the date of payment, the name of the person paying the same, the account upon which the same was paid, and the nature of the funds so paid, whether gold, silver, United States treasury notes, bank bills or territorial (State) or auditor's warrants, or other territorial (State) or county scrip, or evidences of territorial (State) or county indebtedness, and the amount of each separate kind; and that such cash book shall, at all reasonable hours of the day, be open to the inspection and examination of all persons desiring to inspect or examine the same. R. S. 1887, Sec. 1836. Also the penalty for a failure to keep such cash book in the manner directed. Id., Sec. 1839. We do not perceive how this provision affects the question before us one way or the other.

It is true that the bond of the treasurer is made, by statute, to cover any or all violation or violations of his duties as collector of taxes. L. 1890-91, Ch. 45, Sec. 3. But no breach of the bond in that respect is charged in this case.

It is urged, however, that as the statute provides that the treasurer's bond is made to cover all such violations of his duties as collector of taxes, and "Any and all failure or failures on his part to pay over to the proper person or persons any moneys by him received as collector of taxes, and any and all failure or failures of said treasurer to deliver to any person or persons authorized by law to receive the same any books, papers, or other things appertaining to his duties as collector of taxes," he is by

such statute made absolutely responsible for the safe keeping of all moneys received by him as collector, while he holds them as such, and is an insuror as to them — no more liberal rule should be adopted, and the duties of the office of treasurer ought not to receive a more liberal construction after he has paid the moneys to himself and has control of them strictly as the treasurer and permanent custodian thereof.

If a more liberal rule has been adopted, or not so strict a rule prescribed, the fault if any lies with the Legislature. We are not called upon to determine the construction to be accorded the language above quoted, with reference to violations of the duties of collector. Should it be entitled to the construction counsel for the county assumes, we can not agree with him that it requires or even authorizes the court to hold the treasurer to the same kind of accountability after the funds are in his control strictly as treasurer. If persuasive at all, the fact that the Legislature may have constituted the bond of the treasurer security for the absolute safety of the funds in his hands as collector, and has failed to make as stringent declarations respecting the duties of treasurer, is an argument against the position of the county in this case. The provisions of the statute referred to specifically and with evident care apply solely to the office and duties of collector of taxes. If such a provision seems to counsel to have been absurd or useless as applied to that office, and not also to the treasurer, we have only to say that it was and is the concern of the Legislature and not the court.

Respecting the provisions of the criminal code hereinbefore quoted, they are not entitled to much consideration in determining this question unless the deposit in bank constituted an offense punishable under one or the other of those sections. Counsel for defendant in error contends that not only was there no authority for such a deposit, but that the statutes taken together deny the right to make such deposits, and that the treasurer violated the law when he made them. If his act amounted

to such a violation, he committed a criminal offense, and as it is admitted by the pleadings to have been the long-established custom for county treasurers to handle and keep the public funds in that manner, the law has been many times and constantly violated.   Moreover, in the Gramm case the same custom was conceded to have long existed in the case of territorial and State treasurers; and it is a matter of common knowledge that all public treasurers — county, school district, and municipal — throughout the territory and State have customarily kept the funds in their charge in the same way by deposit in banks.   We are not prepared to accept the conclusion of counsel that all of them are guilty of the grave crime of embezzlement.   There may not be, and there does not seem to be, any affirmative declaration of the statutes that public funds may be so deposited for safe keeping; but we have not observed any provision of law which expressly negatives the right of public treasurers to provide in that way for the safety of the funds intrusted to their official custody.   In view of the universal custom in the territory and State, long continued and well known to Legislatures and citizens, we do not believe the court would be warranted in gathering from the statutes by implication a denial of the right of such officers to resort to that method which is the one adopted and approved by the best and most conservative business men in every community.   It is not too much to say that it has been for years and is now regarded by those possessing the largest experience as the most certain means of securing public as well as private funds from loss.   If the officer has been careless or negligent in selecting the bank through which to transact the public business, that is a matter not involved in the legal proposition.

In counsel's brief, reference is made, and on oral argument attention was invited, to Section 7 of Article 15 of the constitution which provides that, "All money belonging to the State, or to any county, city, town, village, or other subdivision, except as herein otherwise

provided, shall, whenever practicable, be deposited in a national bank or banks, or in a bank or banks incorporated under the laws of this State, provided that the bank or banks in which said money is deposited shall furnish security to be approved as provided by law, and shall also pay a reasonable rate of interest thereon. Such interest shall accrue to the fund from which it is derived.'' The constitutional debates were alluded to, for the purpose of ascertaining the object of the incorporation of that provision into the constitution. They do plainly interpret such object if it is not revealed in the section itself. The custom of depositing public moneys in banks was recognized, and it was sought to divorce as far as possible the matter of such deposits from favoritism and politics, and to further the idea therein elsewhere expressed that all accruing interest should benefit the public treasury, rather than the official custodian of the funds. In the opinion in the Gramm case it was expressed as our conviction that the provision was inoperative owing to the failure of the Legislature to enact the necessary laws for its enforcement. That failure continues, notwithstanding another legislative session has convened and adjourned. No provision for taking the security, or the approval thereof, or the selection of the banking depositaries has been made; and the direct representatives of the people during five sessions since the constitution became the fundamental law have by their silence deemed it proper to leave the selection of the banks for deposit and the manner of keeping the funds to the wisdom, skill, diligence, and honesty of the financial officers. It was not the design in the Gramm case to rest our decision upon any recognition of the right to make deposit of public funds in banks, disclosed in the constitutional provision referred to, and we do not think the opinion can reasonably bear any such construction. The matter was merely adverted to, in connection with the general knowledge of the people of the long-prevailing custom of public treasurers. There is no basis for the assumption of counsel that the proposal

of the constitution to withdraw the money from the control of the officer and intrust it to banking depositaries under appropriate security, contemplated at the same time that the officer should stand as an insurer of its safety. That would be the gravest injustice.

The writer of this opinion has no apology to offer for his expression as a member of the constitutional convention when said provision was before it for consideration, nor for any variance between the views then expressed and now entertained. As a perfectly obvious explanation, however, it may be said that no investigation of the legal question, or any examination of our statutes was then made, nor was there occasion or time to do so, and the statements as reported were based upon a mere general recollection that respecting public treasurers a doctrine of strict accountability had been announced by some courts. When the opinion in the Gramm case was prepared, I was well aware of the remarks as reported in the published constitutional debates, but deemed no reference. thereto necessary, nor do I now, but as counsel has apparently deemed it of some importance this brief mention is perhaps excusable.

The argument of counsel based upon the fact that the bank in which the money was deposited was a private institution, not being incorporated under the laws either of Congress or of this State, concerns merely the question of fault or negligence on the part of the officer. In the case of State v. Gramm we held that it was not negligence per se for a trustee to place the funds under his control in a private bank for safe keeping.

Upon the facts, the question of diligence or good faith was excluded from the case in the trial court, and the facts are not before us for consideration.

The fact that Thomas A. Kent, in whose banking institution the moneys were deposited, was also one of the persons who signed the treasurer's bond, is made the burden of an argument for an affirmance of the judgment. That argument is that as Kent lost the money he is certainly

liable if Roberts is not; and that but one motion for a new trial having been filed for all (except one) of the plaintiffs in error, and the judgment being proper, at least as against Kent, it can not, in this court, be successfully assailed by any of those joined in such motion, referring to the case of No. Platte Milling Co. v. Price, 4 Wyo., 293.

The zeal of counsel has led him somewhat intemperately to embellish this argument with an array of most glaring sophistries. Proceeding from the proposition that the banker having received the money on deposit, and failing to return it, is responsible therefor, it is insisted rather than argued that his responsibility can be enforced in this case of a suit upon a bond, even if it should be found that none of the conditions had been broken, and notwithstanding the principal is not liable and has committed no breach of the bond against which he and his sureties have obligated themselves. The argument is based upon a series of inquiries respecting the injustice and absurdity of permitting the banker to excuse himself for the loss of the money and thereby escape liability. There is no doubt whatever that the banker remains responsible for the repayment of the money deposited with him, unless in some way or for some reason he shall have become legally released, and in a proper suit to recover the same the defense interposed by Roberts and his sureties in this case would not avail him. But it seems not to have occurred to counsel that the commonest principles of the law furnished a satisfactory, complete, and positive answer to his contention, and denial of its soundness.

If there is a liability upon the bond, it exists because of a default in some of its conditions. In the case at bar recovery is sought on account of an alleged default. No other cause of action is stated. As an abstract proposition Kent may be liable to account for the money deposited with him, though the treasurer should be exonerated; but this suit is brought upon an express written contract, and the right of recovery is founded upon an alleged breach of its conditions. No separate cause of action against

Kent growing out of his subsequent dealings with the treasurer and his relations to the money deposited with him is alleged, or could have been properly alleged in this case. It is charged in the pleadings that the plaintiffs in error, including Kent, obligated themselves and covenanted that the treasurer would perform certain duties, and pay over certain moneys. If it should be eventually determined that the treasurer had faithfully performed those duties and had paid over all the moneys he was by law or his contract required to pay over, then it will result that there has occurred no default in the contract sued on and no liability upon the obligation; and we are at a loss to understand what principle in the law would warrant the court in this case to hold Mr. Kent upon another and entirely distinct cause of action, not related to the one sued on, nor to any of the issues upon which the case was tried. Whatever may be the liability of any one as a purely abstract proposition, he is entitled to his day in court and to be heard in his defense. The conditions of the bond do not relate to the future conduct of the sureties, but cover the acts of the principal — the treasurer; and the bond provides that if he performs those acts the obligation of the bond shall be void. The proposition is now made that notwithstanding that by the very terms of the bond the obligation thereof may be void, one of the parties thereto shall, nevertheless, be holden thereon. It is clear, however, that the indebtedness of Kent for the money lost while on deposit in his bank arises from obligations independent of the bond.

"It is unnecessary," as was said by Mr. Justice Nelson, "to refer to authorities to show that the liability of the surety can not exceed that of his principal." U. S. v. Allsbury, 4 Wall., 186. While there are some well-defined exceptions to the general rule that wherever there is no principal there can be no surety; and whatever discharges the principal releases the surety, the circumstances of this case do not bring it within any of the exceptions noted in the books. Such exceptions are those which are

not inherent in or do not concern the debt, but are personal to the debtor, such for example as the minority of the principal, and defenses growing out of his insolvency or bankruptcy. The surety, however, may plead and is entitled to any defense which entirely avoids the obligation. 2 Brandt on Suretyship and Guaranty, 2d ed., Sec. 145.

For the reasons above given, the district court erred in excluding the testimony stricken out, and the proof offered to show that the treasurer had acted with prudence, diligence, good faith, honesty, and skill, and to establish his entire lack of fault or negligence.

For these reasons the judgment will be reversed, and the cause remanded for a new trial.

*Reversed.*

KNIGHT, J., concurs.

CORN, J., dissenting.

Mr. Mechum, in his work on public officers, discussing the question of what loss occurring without his fault will excuse an officer from liability, says there are at least four theories. The first, that the officer having bound himself and his sureties without reservation by the express terms of his bond, this obligation can only be discharged by making such payment. The second, that he should be held to a strict accountability for the public money upon the ground of public policy. Third, that by force of the statutes governing the subject he becomes the debtor of the public for the moneys in his hands, and his liability therefore becomes absolute. The fourth view, he maintains, is more consonant with reason and justice, although the cases which maintain it are few. He states it as follows: " By this view the officer is regarded as standing in the position of a bailee for hire and bound *virtute officii*, to exercise good faith and reasonable skill and diligence in the discharge of his trust, or, in other words, to bring to its discharge that prudence, caution, and attention which careful men usually exercise in the management of their

own affairs, but not responsible for any loss occurring without any fault on his part. The statute may of course impose, or the officer may himself assume, a more onerous responsibility, but in the contemplation of this theory, a greater liability does not result from the simple undertaking to faithfully discharge the duties of the office."

An examination of the authorities which sustain them, discloses that the distinction between what are here classed as the first and second theories is very narrow, if it exists at all. They hold alike that the officer and his sureties having entered into an obligation to pay, without reservation or qualification, loss of the funds without negligence or fault will not excuse performance. Some of them assign considerations of public policy as one of the reasons why such loss can not be allowed as an equitable excuse for non-performance, while others do not mention it. Even in cases decided upon the third theory that the officer is a debtor, the distinction is slight. For in such cases also the liability is measured by the terms of the contract of the bond and the technical ownership by the officer of the public funds is emphasized only as rebutting the claim that his liability is governed by the law of bailments. With reference to the fourth view under Mr. Mechem's classification, it is to be observed that the language by which he describes the degree of the officer's responsibility is quoted from the opinion in Cumberland v. Pennell, 69 Me., 357, the leading case supporting that view; and in that case the words are employed to define the common law liability of an officer "in the absence of any statute enlarging it." And in the same case, after reciting that by the Maine statute the only condition required in the bond is "for the faithful discharge of his duties," it is said the officer "might enter into a common law bond making him liable at all hazards." And, in spite of some caustic criticisms of other decisions, the only important distinction actually insisted upon in the Maine case seems to be that the mere enumeration of additional duties in the statute does not have the effect to increase

the degree of the officer's responsibility.    And the court do not attempt to escape from the principle that, if an absolute liability is imposed by statute or assumed by the terms of the bond, such absolute liability must be enforced.

From a consideration of the reasoning of the authorities, thus briefly reviewed, I am of the opinion that the conclusion reached by this court upon the principal proposition in the pending case can not be sustained upon the principles enunciated in any of the cases, including all those adopting what is termed the more liberal rule.

In State v. Gramm, 52 Pac., 532, the majority of this court held the officer and his sureties not liable, upon the ground that the bond containing no express obligation to pay over the funds, the obligation to keep such funds was not tantamount to an obligation to " safely " keep them; and that he was therefore excused upon proof that he had performed his duties with fidelity and with reasonable skill and diligence.    But the conditions of the bond having special reference to the liability of the treasurer in this action are that he " shall pay, according to law, all moneys that shall come into his hands as such treasurer,'' and that he " shall deliver over to his successor in office, or to any other person authorized by law to receive the same, all moneys, books, papers, and other things appertaining thereto, or belonging to his office of county treasurer.''    Here is an obligation without reservation or qualification entered into by the officer and his sureties that he shall deliver over to his successor all moneys belonging to his office.    By force of it, in my opinion, even under the reasoning in Cumberland v. Pennell, and like cases, the county ought to recover.    It is an express contract, and the common law rule of liability no longer applies.

But the majority of the court in discussing the latter clause of the condition say: "It strikes us as illogical and unreasonable to say that when an officer handling public funds has solemnly contracted to keep them safely, that he thereby becomes an insurer of their safety, and

then to hold that without such an agreement one will be imported into a covenant to deliver all money belonging to an office to a successor.'' In my opinion a covenant to deliver the moneys to his successor imports a covenant to keep them safely, because unless he has kept them safely he will be unable to deliver them. But just preceding the last words quoted the court uses this language, '' Whether the agreement of the bond amounted to a promise to pay to the successor all money received and not paid out on orders authorized by law, depends upon a consideration of the question whether that money so lost continued to constitute money pertaining to the office in the sense in which those words are employed in the bond; and the answer to that question depends upon the character or degree of the responsibility of the treasurer for the safe keeping of the money, and whether if such responsibility is not absolute, the circumstances are such as to exonerate him from liability for said loss.'' I am unable to assent to this method of construing the contract. The words seem to be used in their ordinary meaning. Whether the moneys belonged or appertained to the office is a question of fact. Whether the officer was strictly bound or not bound at all for their safe keeping, they belonged and appertained to the office until disposed of according to law.

Of course, if the funds are finally lost or destroyed, they can not be said to belong to the office, because having disappeared or having no existence there can be no title to or ownership in them. But that they can not be said to belong to the office after they are lost is unimportant, from the fact that the responsibility for such loss is the very subject matter of this suit. I do not understand, however, that counsel for plaintiff in error rely upon, or that my associates have sanctioned any such juggling of words as would be involved in such a construction. And I think it is clear that within the meaning of the contract they belong to the office until disposed of according to law. Under any other interpretation the words of the

bond would be entirely nugatory. For if the funds are deemed as no longer belonging or appertaining to the office when they become unavailable by the failure of a bank, the same result would follow in case they had been embezzled or otherwise misappropriated by the treasurer himself. They would in both cases be unavailable, and upon the same reasoning no longer belong or appertain to the office. In my opinion the words have only their usual and ordinary meaning. Property is said to "belong" to an individual when he is rightfully the owner of it, when he has not been lawfully divested of the title. There is nowhere in the bond or the statutes any intimation that the words are used otherwise in this case.

But, in my opinion, Section 7 of Art. 15 of our constitution is strongly persuasive of the liability of an officer in this State in a case like the present, where the funds were deposited in a private bank without security. It provides for the deposit of public moneys in national banks, or banks incorporated under the laws of this State, provided such banks shall furnish security to be approved as provided by law. It is said that this is inoperative, because the Legislature has never provided for the approval of the security spoken of. I am not in sympathy with any method of legal interpretation by which the act, or failure to act of the Legislature may be permitted to defeat a positive provision of the constitution. While it is true there is no power anywhere to compel legislative action, the courts are not absolved from the duty of giving such force and effect to every provision of the constitution as is practicable in the absence of appropriate legislation. And it can not be doubted that this clause was so far operative, at least, that it was the duty of the Legislature to make such provision. Nor can it be doubted that it is so far operative that since its adoption the Legislature has no power to direct or authorize the deposit of public moneys in a private bank without security. If the Legislature then could not direct or authorize such deposit in a private bank, it is going very far to say that the

treasurer without such legislative authority may do what the Legislature is prohibited by the constitution from authorizing him to do, and yet be held harmless in case of loss.    And if it is meant that it is inoperative because the treasurer, by reason of such failure of the Legislature, could not substantially comply with its requirements, it is scarcely true that he could not have substantially complied.    He could have deposited in a bank of the kind prescribed.    He could have taken security for the deposit, and, whether approved under the provisions of any statute or not, such security would have been valid and binding as a common law obligation, and would have protected the county against loss.

It is also strongly persuasive that the rule of strict liability should be adopted by this court, that at the time the statutes governing this subject were adopted, Wyoming was a territory and the Supreme Court of the United States was its court of last resort.    That court has always adhered to the rule of strict liability, never going farther than (as in U. S. v. Thomas) to except cases where the loss was by the act of God or the public enemy.    By a familiar rule, when the Legislature of the territory adopted those provisions they did so with the construction already placed upon them by that court.

I am of the opinion that the evidence was properly excluded and that the judgment should be affirmed.